158 P.3d 1183 (2007)
BISHOP OF VICTORIA CORPORATION SOLE, a British Columbia, Canada, corporation, Appellant,
v.
CORPORATE BUSINESS PARK, LLC, a Washington limited liability company; Joseph C. Finley, an individual; and the marital community composed of Joseph C. Finley and Jane Doe Finley, Respondents.
Joseph C. Finley, Appellant,
v.
Corporate Business Park, LLC, a Washington limited liability company; Bishop of Victoria, Ltd., a Canadian corporation; Victoria Properties, Inc., a Canadian corporation; Norman Isherwood, individually and as a marital community with Jane Doe Isherwood; David Osmond, individually and as a marital community with Jane Doe Osmond, Respondents.
Nos. 33579-4-II, 33909-9-II.
Court of Appeals of Washington, Division 2.
May 8, 2007.
*1185 Robert H. Alsdorf, Davis Wright Tremaine LLP, Richard M. Clinton, Todd Stuart Fairchild, Dorsey & Whitney LLP, Seattle, WA, Samuel John Elder, Jr., Randolph Ian Gordon, Wesley Norman Edmunds, Jr., Gordon Edmunds Elder PLLC, Bellevue, WA, for Appellant.
Randolph Ian Gordon, Wesley Norman Edmunds, Jr., Gordon Edmunds Elder PLLC, Bellevue, WA, Cleveland Stockmeyer, Cleveland Stockmeyer PLLC, Seattle, WA, Sandra Bates Gay, Sandra Bates Gay PS, Bellevue, WA, Robert H. Aldsorf, Davis Wright Tremaine LLP, Richard M. Clinton, Todd Stuart Fairchild, Dorsey & Whitney LLP, Charles Travis Moerk, Seattle, WA, for Respondents.
*1186 PENOYAR, J.
¶ 1 The Bishop of Victoria Corporation appeals a jury verdict in favor of Joseph Finely for damages resulting from a breach of fiduciary and contractual duties, arguing that the court should have granted its motion for judgment as a matter of law. We must decide what duty the manager-members of a limited liability company owe to each other and whether the evidence in this case supports a jury finding that this duty was breached. We reverse.

FACTS
¶ 2 In the late 1980s, Joseph Finley formed Swiftsure Farms, an Arabian horse breeding business in Auburn, Washington. The Bishop of Victoria Corporation Sole (BV), the corporation that holds the real property assets of the Roman Catholic Diocese of Victoria, British Columbia, Canada, gave a substantial loan to Swiftsure Farms after the business suffered financial trouble. Finley was never able to fully repay the debt to BV. FINLEY AND BV FORM A LIMITED LIABILITY COMPANY
¶ 3 In early 1997, Finley approached the leaders of BV with an idea for an investment opportunity. Finley was aware of a large parcel of land in Lacey, Washington (the Lacey Property) that was being sold from a foreclosure lender for one-third its appraised value. Finley proposed that he and BV purchase the Lacey Property with the intention of selling it at a substantial profit, enabling Finley to repay BV for his previous debt. They agreed, and BV and Finley formed a company called Corporate Business Park, LLC (CBP) that would purchase the Lacey Property. BV and Finley were the two sole members of CBP.
¶ 4 The Operating Agreement specified that CBP was a "limited liability company," LLC, engaged "solely in the business of investing in, developing[,] and marketing real property located in the State of Washington." Ex. 405. Members of BV and Finley later testified that Finley agreed to contribute his labor and expertise to CBP and that BV agreed to contribute financially to CBP. Finley had expertise, experience, and knowledge of the Lacey Property, and BV had financial capabilities and financial resources. There was no evidence presented that either party's obligation to contribute was quantified.
¶ 5 Under the terms of the Agreement, Finley and BV were both managers of CBP. The Operating Agreement did not specify the time in which Finley was required to sell the Lacey Property, but BV's financial officer testified that she expected it to sell quickly.
¶ 6 CBP purchased the Lacey Property for approximately $5,000,000 United States dollars (USD) and obtained a mortgage for $5,250,000 in order to have excess proceeds to pay the debt service on the mortgage for one year. CBP first listed the property for sale for $18,000,000.
¶ 7 The Lacey Property did not immediately sell, CBP missed several payments, and CBP exhausted the excess proceeds from the mortgage. BV and Finley then refinanced the first mortgage with AG Capital Funding Partners, L.P., (AG) for $7,500,000. On behalf of CBP, they executed a promissory note and deed in trust for the Lacey Property to AG as security for the refinance.
¶ 8 For a time, CBP was able make the payments to AG from the excess proceeds from the refinance. Eventually, the reserve again ran out, and BV started making monthly payments to AG on behalf of CBP. BV made monthly payments of $81,250 to AG.
LEADERSHIP AT THE VICTORIAN DIOCESE CHANGED
¶ 9 On February 24, 1999, there was a change in leadership at the Victorian Diocese when the old bishop retired and a new bishop replaced him and hired his own staff. As part of this change, the new bishop replaced BV's financial officer.
¶ 10 This change in leadership marked a shift in BV's approach to CBP. The new bishop did not approve of the Diocese's involvement in CBP. BV's new financial officer explained that BV was suffering financially from the mortgage payments to AG and that the new leadership was concerned that the Lacey Property would never sell. *1187 BV's priority became only that the Lacey Property be sold and the debts be satisfied. During trial, the finance officer admitted that, under the new leadership, BV was willing to forfeit any potential profit to CBP in selling the Lacey Property, as long as CBP's debt was satisfied.
¶ 11 Each party suspected the other's motives. The new leadership at BV took the perspective that "Finley has no personal interest in selling the Property unless he can sell it for a premium price that may never be available." Clerk's Papers (CP) at 1039 (BV's Motion for Appointment of a Receiver). Finley accused the new leadership of wanting "to sell the property for pennies on the dollar so that it can withdraw from what the new regime considers to be a bad investment." CP at 1125 (Declaration of Joseph C. Finley Re: Motion for Receiver).
¶ 12 In April 1999, the new bishop decided not to make CBP's April payment to AG. After this missed payment, the interest rate on the principle rose and AG sued CBP, Finley, and BV for foreclosure.
¶ 13 On May 5, 1999, Finley and BV then signed an Addendum to CBP's Operating Agreement. The Addendum specified that Finley owed BV $1,463,936.97 Canadian dollars (CAD) and that CBP owed BV $1,662,666.01 CAD. It stated that, before allocating any profits of CBP to the members, BV would first receive full payment of all outstanding debts to BV. As security for repayment, Finley assigned his interest in CPB to BV. Lastly, the Addendum stated that BV "may, but has no obligation to, make further advances to [CBP]." CP at 2766. Both parties later testified that before this Addendum, BV had agreed to finance CBP's debt service.
¶ 14 AG obtained a judgment of $8,154,895.83 against CBP, Finley, and BV and a decree of foreclosure on the Lacey Property. The trial court issued an order to allow AG to apply the proceeds from a sheriff's sale of the Lacey Property toward payment of the judgment.
¶ 15 BV began exploring options to satisfy the foreclosure judgment. BV's finance officer informed Finley that he would contact other Dioceses in attempt to gain financial help with the foreclosure judgment. At one point, BV offered AG $1,000,000 to release BV from liability under the foreclosure judgment, relieving BV's individual responsibility, but leaving CBP and Finley responsible. BV admitted that this arrangement would have been detrimental to CBP. At trial, BV's finance officer stated that BV should never have been involved in CBP and that BV was interested in ceasing its dealings with AG, the foreclosure judgment, and CBP.
THE DEBENTURES
¶ 16 In 2000, BV raised $13,000,000 CAD dollars from the parishioners of the Victorian Diocese and issued debentures[1] in exchange for their money. In a deed of trust, BV pledged all land BV owned in British Columbia as security for repayment of the debentures. In a supplemental deed of trust, BV purportedly pledged the proceeds of the "Judgment, Mortgage and Loan Documents" as additional security for the debentures. CP at 4376.
¶ 17 The Bishop issued an information statement disclosing that BV planned to use the debenture money to reduce its indebtedness. In the statement, he claimed BV planned to either: (1) reach a settlement with AG; or (2) take over AG's position, recover the Lacey Property, and offer it for sale.
¶ 18 The parishioners' funds were transferred to Fisgard Asset Management (Fisgard),[2] a trustee set up on behalf of the parishioners. BV and Fisgard agreed that Fisgard would purchase the judgment from AG. The interest on the judgment had accrued *1188 and the amount due had grown to $8,701,832.07 USD. Fisgard negotiated with AG and bought the judgment at a discount for $8,296,056.00 USD. Thereafter, AG assigned the judgment and decree of foreclosure to Fisgard.
¶ 19 Relations between Finley and BV came to an impasse and, in September 2000, BV filed a petition seeking appointment of a receiver for CBP. The trial court appointed the receiver as custodian of the assets, operations, and business of CBP. The receiver had the power to manage and operate CBP's assets or to dispose of CBP's operations.
¶ 20 In an order dated May 25, 2001, the trial court ordered the receiver to enter into a partial settlement with Fisgard, in which Fisgard agreed to stay foreclosure actions over the Lacey Property for one year to allow the receiver to sell the property. If the receiver did not sell the Lacey Property by April 26, 2002, the court ordered the receiver to surrender a deed-in-lieu of foreclosure to the Lacey Property to Fisgard. The trial court, the receiver, Finley, and BV all signed the order agreeing to the deed-in-lieu.
¶ 21 The receiver was not able to sell the Lacey Property and, on June 25, 2002, he issued a quit claim deed for all of CBP's interest in the Lacey Property to Fisgard in satisfaction of the judgment and foreclosure actions. A foreclosure sale was not necessary because all title to the Lacey Property passed to Fisgard under the quit claim deed.
¶ 22 On April 5, 2002, Finley filed a motion in the trial court (1) requesting the trial court to find that AG's foreclosure judgment had been satisfied, and (2) requesting the trial court to direct CBP's receiver not to transfer title of the Lacey Property to Fisgard.
¶ 23 The trial court denied Finley's motion and Finley appealed. In an unpublished opinion, we held that (1) the judgment was not satisfied because Fisgard was clearly a separate entity from BV, and (2) Finley had no claims to the Lacey Property and the receiver had full right to issue the deed to Fisgard under the trial court's order. Bishop v. Finley, 121 Wash.App. 1041, 2004 WL 1053215, 2004 Wn.App. LEXIS 974. We explained that we could not reach Finley's claims for damage arising from the relationship between Finley and BV because the trial court had not ruled on these issues. Bishop v. Finley, 121 Wash.App. 1041, 2004 WL 1053215, 2004 Wn.App. LEXIS 974.
FINLEY PURSUED HIS REMAINING CLAIMS
¶ 24 On remand, BV moved for summary judgment of Finley's claims on several grounds, but the trial court only granted summary judgment to BV on the issue that CBP's Operating Agreement was the controlling contract between the parties and CBP. It ruled that parole evidence could not be used to alter the written terms in the Operating Agreement or Addendum.
¶ 25 After all evidence had been presented to the jury and before the jury deliberated, BV filed a motion for judgment as a matter of law. BV argued that, as a matter of law, the trial court should dismiss the claims against BV. Without ruling on BV's motion, the trial court allowed the jury to deliberate.
¶ 26 The jury issued a verdict in Finley's favor for approximately $8,169,000 on his breach of contract claim and approximately $4,200,000 on his breach of fiduciary duty claim. After the verdict, the trial court heard argument on BV's motion for judgment as a matter of law and denied BV's motion. BV now appeals.

ANALYSIS
I. STANDARD OF REVIEW
¶ 27 BV appeals the trial court's denial of its motion for judgment as a matter of law. The parties disagree about the appropriate standard of review. BV asserts that we review a motion as a matter of law de novo. Finley asserts that we must give a jury verdict a presumption of correctness and do not review a jury verdict de novo.
¶ 28 BV filed a motion for judgment as a matter of law at the close of evidence and before the jury deliberated. The trial court did not rule on the motion, allowed the jury to deliberate, and agreed to treat BV's motion as a motion made before submitting the *1189 case to the jury pursuant to CR 50(1). A party may move for judgment as a matter of law at any time before a case is submitted to a jury. CR 50(a)(2). Judgment as a matter of law is granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party. CR 50(a)(1). If the court does not grant a motion for judgment as a matter of law that was filed at the close of evidence, the court is considered to have submitted the action to the jury subject to the court later deciding the legal questions the motion raised. CR 50(b). In ruling on a renewed motion for a matter of law after a jury verdict, the court may either (1) allow the judgment to stand, (2) order a new trial, or (3) direct entry of judgment as a matter of law. CR 50(b)(1)(a)-(c). Here, the trial court allowed the judgment in favor of Finley to stand.
¶ 29 A trial court appropriately denies a motion for judgment as a matter of law if, viewing the evidence most favorably to the nonmoving party, it can say as a matter of law that there is substantial evidence to sustain the verdict for the nonmoving party. Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997). A motion for judgment as a matter of law can be denied only when there is competent and substantial evidence on which the verdict can rest. State v. Hall, 74 Wash.2d 726, 727, 446 P.2d 323 (1968). Evidence is substantial to support a verdict if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise. Brown v. Superior Underwriters, 30 Wash.App. 303, 306, 632 P.2d 887 (1980). When reviewing a motion for judgment as a matter of law, we apply the same standard as the trial court. Goodman v. Goodman, 128 Wash.2d 366, 371, 907 P.2d 290 (1995). The inquiry on appeal is limited to whether the evidence presented was sufficient to sustain the jury's verdict. Hizey v. Carpenter, 119 Wash.2d 251, 272, 830 P.2d 646 (1992). If it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict, then denial of a motion for judgment as a matter of law was inappropriate and the trial court should have granted judgment as a matter of law. Hizey, 119 Wash.2d at 272, 830 P.2d 646. We must therefore determine, de novo, if there was competent and substantial evidence to support the jury's verdict for Finley.
II. FIDUCIARY DUTY
A. ARGUMENTS
¶ 30 BV argues that there is no evidence that it breached a fiduciary duty because there is no duty for a partner to continue investing in a poorly planned business. It asserts that, as a matter of law, it had no duty to continue funding CBP because neither the Operating Agreement nor the Addendum required it to do so. BV asserts that none of its actions in regard to the debentures was adverse to CBP because CBP and Finley were in the same situation before and after Fisgard purchased the judgment from AG. BV asserts that CBP's position was neither changed nor compromised as a result of BV's actions.
¶ 31 Finley asserts that BV breached its fiduciary duties when it defaulted on the mortgage payment to AG and thereafter embarked on a course of conduct that was adverse to Finley and CBP. Finley asserts that BV did not notify Finley of the debentures and secretly obtained "an interest in the Lacey Property adverse to CBP." Br. of Resp't Finley at 7. Finley asserts that BV breached its fiduciary duty when it obtained and maintained an interest in the Lacey Property to the exclusion of Finley.
B. BV and Finley's Duties to the LLC
¶ 32 To address this issue, we must first clarify BV and Finley's duties and obligations to CBP and to each other as members of CBP. After the change in leadership at the Diocese and BV, the new bishop declined to make the April payment to AG. The mortgage went into default, the interest rate increased, and AG to pursued foreclosure actions against CBP. Finley argues that by missing the payment, BV breached a fiduciary duty by causing "the business to fail." Br. of Resp't Finley at 31. Whether this is true depends on the parties' legal relationship to CBP, which is determined by their agreements.
*1190 ¶ 33 An LLC may be managed in two ways. RCW 25.15.150. It may either be member-managed or manager-managed. RCW 25.15.150. Because CBP's Operating Agreement specified that both BV and Finley were managers of CBP, it was a member-managed LLC. In Washington, the fiduciary duties imposed in member-managed and manager-managed LLCs are the same. DAVID TINGSTAD, ET AL., LIMITED LIABILITY COMPANIES AND LIMITED LIABILITY PARTNERSHIPS IN WASHINGTON, 15 (National Business Institute, Inc. 2003).
¶ 34 A member of an LLC is obligated to the LLC to perform any promise to contribute cash, property, or services to the LLC in exchange for his or her interest in the LLC. RCW 25.15.195(1), .190. The obligation to contribute to an LLC arises from the parties' contractual agreements. NICHOLAS KARAMBELAS, LIMITED LIABILITY COMPANIES, LAW, PRACTICE AND FORMS, 2d, Vol. 1, 7-1 (Thomson West 2005).
¶ 35 CBP's Operating Agreement stated that, "Except as provided in a Contribution Agreement, the Company has no right to require any Member to make additional contributions." E. 405. We found no "Contribution Agreement" in the record before us and the Operating Agreement does not state that BV was required to make payments on behalf of CBP. Ex. 405. The parties testified that BV initially supported CBP financially, but this evidence is not relevant to the parties' obligations. The parties do not contest the trial court's summary judgment ruling that parole evidence would not be allowed to alter the terms of any of CBP's agreements and that the parties' written contractual agreements controlled. Because the parties' written agreements controlled, and the agreements do not state that BV was obligated to financially contribute to CBP, BV had no contractual obligation to financially contribute. Thus, BV did not violate any contractual obligation by missing the April payment to AG or causing CBP to default on its mortgage to AG.
¶ 36 While a member's obligation to contribute to the LLC arises from the parties' contractual agreements, a member's fiduciary duty arises by virtue of the parties trust relationship. Van Noy v. State Farm, 142 Wash.2d 784, 797-98, 16 P.3d 574 (2001) (citing J. DENNIS HYNES, FREEDOM OF CONTRACT, FIDUCIARY DUTIES, AND PARTNERSHIPS: THE BARGAIN PRINCIPLE AND THE LAW OF AGENCY, 54 WASH. LEE L.REV. 439, 441-42 (1997)). An LLC manager is entitled to rely in good faith on other managers. Dickens v. Alliance Analytical Labs., LLC, 127 Wash. App. 433, 440, 111 P.3d 889 (2005) (citing RCW 25.15.175). The role of members in a member-managed LLC is analogous to that of partners in a general partnership, and partners are held accountable to each other and the partnership as fiduciaries. JOHN MOREY MAURICE, OPERATIONAL OVERVIEW OF THE WASHINGTON LIMITED LIABILITY COMPANY ACT, 30 GONZ. L.REV. 183, 200 (1995).
¶ 37 Partners owe each other fiduciary duties and are obligated to deal with each other with candor and the utmost good faith. Bovy v. Graham, 17 Wash.App. 567, 570, 564 P.2d 1175 (1977). A partner owes a fiduciary duty of loyalty and care to both the partnership and to other partners. RCW 25.05.165. A partner owes a duty of loyalty to avoid secret profits, self-dealing, and conflicts of interest. RCW 25.05.165(2)(a)-(c). A partner must avoid self-dealing by refraining from dealing with the partnership on behalf of a party having an interest adverse to the partnership. RCW 25.05.165(2)(b). And a partner must avoid conflicts of interest in refraining from competing with the partnership. RCW 25.05.165(2)(c). A partner owes a duty of care to refrain from engaging in grossly negligent conduct, intentional misconduct, and knowing violations of law. RCW 25.05.165; also RCW 25.15.155. But a member's obligation to contribute to an LLC cannot be expanded beyond the members' agreements by reference to a general fiduciary duty of loyalty. An obligation to contribute to an LLC is different from the fiduciary obligation of loyalty and care because they arise from different relationships. The duty to contribute is set by the parties' agreements and fiduciary duties arise from the parties' relationship to each other.
¶ 38 As discussed above, BV had no obligation to make payments on behalf of CBP. *1191 Even if it had such an obligation, the one missed payment to AG is not sufficient evidence to form the basis of a breach of fiduciary duty. It was not the single event that pushed CBP into financial turmoil and caused the business to fail  CBP failed as a business because it defaulted on the mortgage to AG, was unable to become current on the mortgage, had no financial resources, and was thereafter forced into foreclosure on its sole asset. BV never agreed to make any continuing payments on CBP's indebtedness. Perhaps Finley could have argued that he relied on BV's continuing payments to his detriment. However, Finley became aware of the missed payment within a month and the record does not reflect that he lost any opportunity he might otherwise have had to maintain an interest in the Lacey Property.
C. BV's Actions to Satisfy the Foreclosure Judgment
¶ 39 After the trial court entered the foreclosure judgment, BV offered AG $1,000,000 to release it from its obligation to the judgment. Finley asserts that BV breached its fiduciary duty by this offer, but the settlement never occurred. Even if it had, BV's settlement offer was not adverse to CBP and cannot form a legally sufficient evidentiary basis for a breach of fiduciary duties, because, after the proffered settlement, BV still would have been obligated to the judgment as a member of CBP. BV would have been individually released from the judgment, but CBP would not. "A partner does not violate a duty or obligation . . . merely because the partner's conduct furthers the partner's own interest." RCW 25.05.165(5). This settlement offer is not sufficient evidence of a breach of fiduciary duty because, although it was in BV's interest, it was not adverse to CBP's interest.
¶ 40 In another attempt to satisfy AG's judgment, BV found a buyer for the Lacey Property that was willing to pay AG $7,500,000 USD, which would have eliminated CBP, Finley, and BV's debt to AG. This also cannot be the basis for a breach of fiduciary duty because the offer was not adverse to CBP.
¶ 41 Finley also asserts that BV breached a fiduciary duty by not informing Finley of its solicitation of funds from the Diocese parishioners and issuing debentures to the parishioners. A partner should not make any false statement to his copartner. Bovy, 17 Wash.App. at 570, 564 P.2d 1175. The good faith obligation of a fiduciary relationship requires a partner to abstain from concealment concerning partnership matters. Bovy, 17 Wash.App. at 570, 564 P.2d 1175. Each member of the partnership is required to fully disclose all known information that is significant and material to the affairs or property of the partnership. Bovy, 17 Wash. App. at 570, 564 P.2d 1175 (emphasis added). Partners are confidential agents of each other and have a right to know all that the other partner knows and are required to fully disclose all material facts that relate to partnership affairs. Karle v. Seder, 35 Wash.2d 542, 550, 214 P.2d 684 (1950) (emphasis added). A material nondisclosed fact in the contest of a general partner's fiduciary duty is one that "might be expected to have induced action or forbearance by the other partners." Diamond Parking, Inc., v. Frontier Bldg. P'ship, 72 Wash.App. 314, 320, 864 P.2d 954 (1993) (quoting 2A BROMBERT & L. RIBSTEIN, PARTNERSHIP, § 6.06 at 6:64 (1992)). What is material depends on the specific context and the partners' knowledge and information. Diamond Parking, 72 Wash.App. at 320, 864 P.2d 954.
¶ 42 It is undisputed that BV did not disclose to Finley its plan to solicit funds from the Diocese's parishioners in order to manipulate the parishioners' purchase of the judgment from AG. However, BV did not breach its duty of disclosure by not disclosing this information because partners need only disclose material facts. Disclosure could not have induced any action of forbearance on CBP's part. Therefore, BV's failure to disclose is not sufficient evidence to provide a basis for a breach of a fiduciary duty.
¶ 43 Finley asserts that "BVC obtained interests in the Lacey Property to the exclusion of Finley." Br. of Resp't Finley at 15. Finley's brief continuously asserts that BV owned an interest in the Lacey Property and bought the Lacey Property. Br. of *1192 Resp't Finley at 31. We previously held that Finley has no claims to the Lacey Property and that the receiver had full right to issue the deed to Fisgard under the trial court's order on May 25, 2001. Bishop v. Finley, 121 Wash.App. 1041, 2004 WL 1053215, 2004 Wn.App. LEXIS 974. The mere fact that BV may have positioned itself to recover part of its loses did not prejudice Finley because CBP was in no position to salvage the property.
¶ 44 Finley asserts that the sale to Fisgard was adverse to CBP because it eliminated the one-year period in which a party may reclaim a property after a foreclosure sale. This also does not provide sufficient evidence that BV breached a fiduciary duty because there is no evidence that CBP would have been able to obtain financing to purchase the Lacey Property. Further, the receiver, Finley, and BV all agreed to and signed the order, and Finley cannot now claim that this order breached a fiduciary duty.
¶ 45 We hold that there was no legally sufficient evidentiary basis for the jury to find that BV breached a fiduciary duty, and we reverse the trial court's denial of BV's motion as a matter of law. Neither the fact that BV acted to protect itself from further losses nor the fact that BV may have obtained some reversionary interest in the Lacey Property breached any duty to Finley because CBP had lost any ability to profit from the situation. Thus, because there was not sufficient evidence to support the jury's verdict, judgment as a matter of law was appropriate. CR 50(a)(1).
II. CONTRACTUAL DUTY
¶ 46 Finley's arguments that BV breached its contractual duty mirror his arguments that BV breached a fiduciary duty. Finley seems to argue that BV breached its contractual duty by (1) defaulting on the payment to AG, (2) engaging in a course of conduct adverse to Finley and CBP by obtaining an interest in the Lacey Property, (3) wanting to liquidate the property, and (4) developing an unreasonable expectation that the Lacey Property would sell quickly.
¶ 47 As discussed above, the Operating Agreement does not state that BV was obligated to make payments on behalf of CBP. And the trial court entered summary judgment that parole evidence would not be allowed to admit evidence to alter the terms in the Operating Agreement. Therefore, there is also not sufficient evidence that BV breached the Operating Agreement by refusing to make the one mortgage payment to AG in April 1999. There is no section of the Operating Agreement stating that BV was obligated to make payments and the Addendum stated that BV had no obligation to make advances to CBP.
¶ 48 Finally, Finley argues that BV breached the Operating Agreement by developing an unreasonable expectation that the Lacey Property would sell quickly. Section 3.01 states that CBP would be "engaged solely in the business of investing in, developing and marketing real property located in the State of Washington." Ex. 405 (emphasis added). And Section 3.03 states:
(b) The Members therefore agree that:
(i) it is unreasonable for any Member to have or rely on an expectation that is not reflected in this Agreement;

(ii) any Member who has or develops an expectation contrary to or in addition to the contents of this Agreement has a duty to
(A) immediately inform the Managers and all other Members, and
(B) promptly seek to have this Agreement amended to reflect the expectation.
Ex. 405 (Emphasis added).
¶ 49 Under the new leadership at the Diocese, BV did not want to be obligated to make payments on behalf of CBP. Although this may have been an "expectation contrary to . . . the contents of [the Operating] Agreement," after the change in leadership at BV, BV and Finley promptly amended the Agreement to reflect BV's changed expectation and therefore complied with Section 3.03(ii)(B) and was not in breach of the Operating Agreement. See Ex. 405.
¶ 50 BV testified that, after the change in leadership at the Diocese, BV became interested only in selling the Lacey Property and satisfying the debt owed to BV and AG. It *1193 was not interested in making a profit for CBP or Finley. Finley argues that this change was a breach of the parties' expectations under the Agreement. Finely asserts that BV only wanted to "liquidate" the Lacey Property, not invest in, develop, and market the Lacey Property as stated in the Agreement. Br. of Resp't Finely at 28.
¶ 51 It was reasonable for BV to want to liquidate CBP's asset to discharge the foreclosure judgment, and BV did not develop an unreasonable expectation in violation of the Operating Agreement. There is no evidence that BV breached its contract with Finley and we reverse the trial court's denial of BV's motion for judgment as a matter of law.
¶ 52 In addition to his argument regarding the motion for judgment as a matter of law, BV also argues that the trial court (1) erred in allowing Finley to present evidence, arguments, and jury instructions in conflict with this court's prior ruling in Bishop v. Finley, 121 Wash.App. 1041, 2004 WL 1053215, 2004 Wn.App. LEXIS 974; (2) erred in allowing the jury to make its own definitions of legal duty; (3) erred by not informing counsel of possible jury passion and prejudice; and (4) abused its discretion by not granting a new trial when the jury returned its verdict. Because we hold that the trial court should have granted BV's motion as a matter of law, we need not reach these arguments.
¶ 53 Finley challenges the trial court's award of attorney fees, its rulings regarding his attempts to collect on his judgment, and a pretrial order. He also requests attorney fees and costs on appeal. Because we reverse the underlying judgment against BV, we need not address these issues and decline to award Finley attorney fees and costs.
¶ 54 BV also requests attorney fees in the last sentence of its brief. However, under RAP 18.1(b) the party requesting attorney fees must devote a section of its opening brief to the request for the fees or expenses. Argument and citation to authority are required under the rule to advise us of the appropriate grounds for an award of attorney fees as costs. Austin v. U.S. Bank of Wash., 73 Wash.App. 293, 313, 869 P.2d 404. Wilson Court Ltd. P'ship v. Tony Maroni's Inc., 134 Wash.2d 692, 710 n. 4, 952 P.2d 590 (1998). See also Denaxas v. Sandstone Court of Bellevue, L.L.C., 148 Wash.2d 654, 671, 63 P.3d 125 (2003). BV cited to no legal authority and provided no argument in regard to its request for attorney fees. We therefore also decline to award BV attorney fees.
We concur: HOUGHTON, C.J., and VAN DEREN, J.
NOTES
[1] A debenture is a bond that is backed only by the general credit and financial reputation of the corporate issuer, not by a lien on corporate assets. BLACK'S LAW DICTIONARY 430 (8th ed.2004).
[2] Fisgard was formerly called United Homes Victoria, Ltd. Throughout the trial court proceedings, and the first appellate review of BV and Finley's transaction, Fisgard was referred to as United Homes. But, the parties refer to the trustee as Fisgard, and we will continue to do so here.