IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| OLEG A. KIFORENKO as trustee for the EARL G. STOKES LIVING TRUST DATED DECEMBER 12, 2003; STEAMWORKS SEATTLE LLC, a Washington Limited Liability Company; and STEAMWORKS SEATTLE REAL LLC, a Washington Limited Liability Company, | No. 86701-6-I |
| Appellants, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| ROSS H. MOORE, an individual and as trustee for the ROSS H. MOORE 2003 REVOCABLE TRUST, | |
| Respondent. | |

CHUNG, J. — Earl G. Stokes and Ross H. Moore formed Steamworks Seattle, LLC (Steamworks) and Steamworks Seattle Real, LLC (Steamworks Real). Stokes and Moore later each entered agreements assigning their rights in Steamworks and Steamworks Real to their respective trusts. Stokes passed away in 2022. Subsequently, Stokes's surviving spouse, Oleg A. "Alex" Kiforenko, as trustee of the Stokes Trust, filed a complaint against Moore on behalf of the Stokes Trust, Steamworks, and Steamworks Real. The complaint alleged that Moore breached his fiduciary duties and sought remedies including removal of Moore as manager. The trial court concluded that the Stokes Trust did not have standing to bring the complaint and granted summary judgment in favor of Moore. Kiforenko challenges the trial court's grant of summary

judgment and its denial of a continuance to conduct discovery based on CR 56(f). We affirm.

## FACTS

In 2007, Earl Stokes and Ross Moore together formed Steamworks and Steamworks Real (collectively "the Companies"). The primary purpose of Steamworks was "to own and manage a men's spa known as 'Steamworks Seattle,' " and the primary purpose of Steamworks Real was "to own and manage certain real property" where the spa was located. The Companies' operating agreements (collectively "Operating Agreements") identified Stokes and Moore as the members of the Companies, and each held 50 percent shares in both companies.

In 2008, Stokes and Moore each executed assignment agreements for Steamworks and Steamworks Real naming their respective trusts—Earl G. Stokes 2003 Revocable Trust and Ross H. Moore 2003 Revocable Trust—as assignees of their respective rights and interests in the two Companies. For example, Stokes's assignment agreement for Steamworks provides:

> Earl G. Stokes ("Assignor"), under Section 8.2 of that certain Operating Agreement for Steamworks Seattle, LLC, a Washington limited liability company [ ], herewith assigns, transfers and sets over unto the Earl G. Stokes 2003 Revocable Trust ("Assignee"), all of Assignor's right, title, and interest under the aforementioned Agreement, and in all securities in Steamworks Seattle, LLC . . . .
>
> Assignee, as the assignee of Assignor's Fifty percent (50%) membership interest, herewith unconditionally assumes and accepts the above assignment and transfer . . . .

Similar language appears in the assignment agreement Stokes executed regarding his membership interests in Steamworks Real and those that Moore executed regarding his membership interests in both Companies.[1]

In 2022, Stokes passed away. Prior to his death, Stokes named his spouse, Alex Kiforenko, as successor trustee for the Stokes Trust. In November 2023, Kiforenko, as successor trustee of the Stokes Trust, filed a complaint against Moore for breach of fiduciary duty, removal of Moore as the manager of the Companies, dissolution of the Companies, a full accounting of the Companies, and appointment of a receiver.

Moore did not file an answer to Kiforenko's claims and instead filed a motion to dismiss in February 2024 challenging the Stokes Trust's status as a member of the Companies and its standing to bring direct and derivative claims. Kiforenko responded, asserting that Moore's motion should be treated as a CR 56 motion for summary judgment because both parties presented evidence outside of the complaint.

Kiforenko also requested a CR 56(f) continuance to conduct discovery. In March 2024, Moore filed a motion for a protective order seeking to delay discovery responses to Kiforenko, which the court granted, reasoning that the pending motion to dismiss was based on lack of standing, a legal question that could be resolved without discovery.

At an April 2024 hearing on Moore's motion to dismiss, the trial court agreed with Kiforenko that the appropriate standard was summary judgment. The trial court then granted summary judgment in favor of Moore and dismissed all of Kiforenko's claims based on the Stokes Trust's lack of standing. Moore filed a motion for an award of attorney fees and costs, which the trial court denied.

---

[1] As the language in Stokes's assignment agreements is identical, the analysis is the same as to the issue on appeal, Stokes Trust's membership rights in both of the Companies.

Kiforenko timely appeals. Moore cross-appeals the trial court's denial of his motion for attorney fees and costs.

DISCUSSION

Kiforenko challenges the trial court's grant of summary judgment in favor of Moore, arguing that there are genuine issues of fact about whether the Stokes Trust is a member of the Companies and, thus, whether the Stokes Trust has standing to bring direct and derivative claims on the Companies' behalf. Kiforenko also challenges the trial court's decision denying his request to continue the summary judgment hearing to allow discovery. In addition to appealing the trial court's denial of attorney fees and costs, Moore seeks appellate attorney fees and costs.

I. Summary Judgment

On appeal, courts review orders granting summary judgment de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). A reviewing court considers "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Id.

Summary judgment is proper when "there is no genuine issue as to any material fact," meaning the moving party is entitled to judgment as a matter of law. CR 56(c). A "material fact" exists when such fact impacts the outcome of the litigation. Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). The moving party can submit affidavits demonstrating an absence of a material issue or can demonstrate that the nonmoving party lacks competent evidence to support an essential element of their claim. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989). When the moving party satisfies the initial burden, the burden then shifts to

4

the nonmoving party to demonstrate the existence of an element essential to their case of which they will bear the burden of proof at trial. Id. at 225. There is a genuine issue of material fact when "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Keck, 184 Wn.2d at 370. The failure to make such showing will result in the trial court granting summary judgment. Young, 112 Wn.2d at 225.

Kiforenko's claims all require the plaintiff, the Stokes Trust, to be a member of the Companies. To bring a derivative action to enforce a right of an LLC, the plaintiff must be a member at the time of bringing the action and either (1) the plaintiff must have been a member at the time of the complained-of transaction, or (2) "the plaintiff's status as a member had devolved upon the person by operation of law or pursuant to the terms of a [LLC] agreement from a person who was a member at the time of the transaction." RCW 25.15.386, .391. Similarly, "fiduciary duties arise from the [members'] relationship to each other." Bishop of Victoria Corp. Sole v. Corp. Bus. Park, LLC, 138 Wn. App. 443, 456, 158 P.3d 1183 (2007). "The only fiduciary duties that a member . . . or a manager has to the [LLC] and its members are the duties of loyalty and care . . . ." RCW 25.15.038(1)(a). A trustee "has the sole right and responsibility to enforce a cause of action in favor of the trust" and "has all powers of management and control of the trust property." Mine Holding Tr. v. Pavlish, 32 Wn. App. 2d 727, 744, 559 P.3d 517 (2024).

Moore asserts that Kiforenko as trustee of the Stokes Trust lacked standing to bring direct or derivative claims because upon his death, Stokes was disassociated as a member of the Companies, and the Stokes Trust was not a member of the Companies. Moore claims the Stokes Trust holds only an economic interest and was not owed any

fiduciary duties. Kiforenko counters that the Operating Agreements allowed Stokes to transfer his full membership rights and that he presented evidence that Stokes did so.[2]

### A. Operating Agreement Provisions on Transferring Membership Interests

We first address what the Operating Agreements require for a transfer of full membership rights.

The primary purpose of contract interpretation is to determine the parties' intent. Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 250, 327 P.3d 614 (2014). Courts can ascertain the parties' intent by determining the "objective manifestations of the agreement." Condon v. Condon, 177 Wn.2d 150, 162, 298 P.3d 86 (2013). Further, when interpreting a contract, we give the actual words in the contract "their ordinary, usual, and popular meaning," absent contrary intent. Id. at 163. When multiple written documents "relate to the same subject matter, are not inconsistent with each other and appear to be executed as part of the same transaction, they may be considered together to determine the parties' intent." Spokane Helicopter Serv., Inc. v. Malone, 28 Wn. App. 377, 382, 623 P.2d 727 (1981). "Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic

---

[2] As an initial matter, Kiforenko asserts that because the Operating Agreement for Steamworks is not signed, there is a question of fact "whether the Operating Agreement that is being relied upon by Moore is even applicable in this case." However, as Moore points out, Kiforenko himself offered the unsigned agreement into evidence as a " 'true and correct copy of a [LLC] agreement for Steamworks Seattle LLC,' " and Moore likewise attested that this agreement was fully executed by him and Stokes. Thus, neither party disputes that these Operating Agreements were the controlling documents regarding membership. Kiforenko also argues that the court's order staying discovery prevented him from exploring this issue, but he provides no authority or argument explaining why additional discovery was necessary to determine whether these were the Operating Agreements in effect. See RAP 10.3(a)(6) (the appellant has the burden of providing argument and authority on an issue).

evidence." <u>Tanner Elec. Coop. v. Puget Sound Power & Light Co.</u>, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996).

While contract interpretation determines the meaning to the words and language used, contract construction determines the legal consequences that flow from context and the terms of the contract. <u>Berg v. Hudesman</u>, 115 Wn.2d 657, 663, 801 P.2d 222 (1990). Contract construction is "always a question of law." <u>Kim v. Moffett</u>, 156 Wn. App. 689, 697, 234 P.3d 279 (2010). On appeal, "[a]bsent disputed materials, the construction or legal effect of a contract is reviewed de novo." <u>In re Estate of Petelle</u>, 195 Wn.2d 661, 665, 462 P.3d 848 (2020).

Here, Section 1.26 of the Operating Agreements defines a "Member" as "a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member." Section 1.36 defines "Person" to include "an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity." Section 1.27 defines "Membership Interest" as "the rights and obligations of a Member hereunder and any right to information concerning the business and affairs." Section 1.47 defines "Transfer" as "any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest *or any element of* such a Membership Interest." (Emphasis added.)

Section 8.2 of the Operating Agreements addresses the requirements for transferring and assigning membership interests:

> **8.2    Transfer and Assignment of Interests.** Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company . . . *unless (a) the Manager and all Members approve the transferee's admission to the Company as a Member upon such Transfer*, which admission shall be in the reasonable discretion of the Manager and based on its determination

7

that the Transfer will not adversely affect the Company or its interests and the financial wherewithal and strength of the proposed assignee . . . . Any Transfer or Encumbrance of a Membership Interest without such approval shall be void . . . .

(Emphasis added.) Section 8.2 also includes an exception from the required manager and member approval if a member transfers rights to their revocable trust:

[A] Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue; provided, that the Member retains a beneficial interest in the trust and all of the Voting rights hereunder included in such Membership Interest. *A transfer of a Member's entire beneficial interest in such trust or failure to retain such Voting rights shall be deemed a Transfer of a Membership Interest.*

(Emphasis added.)[3]

Here, the assignment agreements state that "under Section 8.2" of the Operating Agreements, Stokes "assigns, transfers, and sets over unto [the Stokes Trust] ("Assignee"), *all of the Assignor's right, title, and interest*" under the Operating Agreement. (Emphasis added.) Moore argues that despite this broad language, under the exception in Section 8.2, Stokes still retained a beneficial interest in the trust and all

---

[3] The procedure set out in Section 8.2 comports with the applicable statute, RCW 25.15.116, which allows admission of members as follows, in relevant part:

**Admission of members.**
(1) In connection with the admission of the initial member or members of a limited liability company, a person acquiring a limited liability company interest is admitted as a member of the limited liability company upon the later to occur of:
. . .
(2) . . .
(b) In the case of a transferee of a limited liability company interest, upon compliance with any procedure for admission provided in the limited liability company agreement or, if the limited liability company agreement does not so provide or does not exist, upon the consent of all members and when the person's admission is reflected in the records of the limited liability company agreement . . . .

In this case, Section 4.3(b) of the Operating Agreements, "Admission of Additional Members," provides that to be admitted as a member, the manager must approve their admission, and "Additional Members added under this Section must sign the signature page to this Agreement agreeing to be bound by all the rights, obligations, preferences and privileges of this Agreement."

of the voting rights because the Stokes Trust was never approved or admitted as a member of the Companies.

Kiforenko acknowledges the exception under Section 8.2 is limited to transfers of economic interests to a member's trust and that as to other membership interests, "[i]f the Member does not receive approval of the Membership Transfer from the Manager and all LLC Members, then the transfer is deemed void." Indeed, Section 8.2's requirement of approval not only by a manager, but also by all members aligns with other language in the Operating Agreements that demonstrates[4] Stokes's and Moore's intent to go into business together and to limit membership. For example, Section 8.5 provides the Companies the right of first refusal to purchase a member's membership interest upon the occurrence of a triggering event (including death, incapacity, or bankruptcy of a member), a dissolution of a member's marriage, or death of a member's spouse that impacts the member's interest. And Section 10.15 requires a spouse of a member to sign a consent acknowledging that "the other Members [have] an option to purchase all of [the member's] Membership Interest, including my community interest (if any) in it."

Moore also claims that to transfer full membership interests, Stokes had to comply not only with Section 8.2, but also with Section 8.8 regarding substitution of members. Section 8.8 provides as follows:

> **8.8** **Substitution of Members.** *Except as expressly permitted under Section 8.2*, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Member Interest (a "Substituted Member") only (a) by the Manager in favor of the prospective transferee's admission as a Member,

---

[4] Moore attests that they intended to form the Companies "for the purpose of owning and operating the Seattle Steamworks business and owning the real property on which the business was located."

and (b) *on such prospective transferee's executing a counterpart of this Agreement as a party hereto*. Any prospective transferee of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.

(Emphasis added.) However, the plain language of Section 8.8's opening phrase— "[e]xcept as expressly permitted under Section 8.2"—distinguishes substitution of members from Section 8.2's process of transferring membership rights. Further, Section 8.2 provides for transfer of membership interests if "the Manager and all Members *approve the transferee's admission to the Company as a Member* upon such Transfer," without cross-referencing Section 8.8 (Substitution of Members). We disagree with Moore that an effective transfer of membership rights requires compliance with Section 8.8.

### B. Evidence of Assignment of Membership Rights to Stokes Trust

Next, we address Kiforenko's arguments that he presented sufficient evidence to raise a genuine issue of material fact as to whether (1) Stokes assigned his entire membership interest in the Companies to the Stokes Trust, (2) Moore as manager of the Companies approved the transfer, and (3) both Stokes and Moore, as the only members of the Companies, approved the transfer.

Stokes's assignments list Earl G. Stokes as the "Assignor" and the Earl G. Stokes 2003 Revocable Trust as the "Assignee."[5] As noted above, Stokes's assignment agreements provide that Stokes "assigns, transfers and sets over unto the Earl G.

---

[5] According to the Operating Agreements, an "Assignee" is "a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member." Notwithstanding this more limited definition of "Assignee," Section 8.2 clearly allows a member to assign their entire beneficial interest through an assignment agreement, which may also define the term "assignee" for purposes of that assignment.

Stokes 2003 Revocable Trust ("Assignee"), all of Assignor's right, title, and interest."

Further, the assignment agreements state that the Stokes Trust, "as the assignee of

Assignor's Fifty percent (50%) membership interest, herewith unconditionally assumes

and accepts the above assignment and transfer." Without more, this language was

sufficient to transfer Stokes's economic membership rights pursuant to the exception

under Section 8.2.

But as discussed above, for an effective transfer of all membership rights,

Section 8.2 also requires "the Manager and all Members [to] approve the transferee's

admission to the Company as a Member upon such Transfer." Kiforenko claims that

Section 8.2 was satisfied because the transfer "was approved by Moore, as manager of

both LLCs, and by both Stokes and Moore as the only members." In support, Kiforenko

points to the fact that the Stokes Trust is listed on the Companies' IRS K-1 forms in

2008 and 2022. But these IRS filings do not prove that Stokes Trust had full

membership rights; rather, as Moore notes, they "are completely consistent with the

Operating Agreements" because "[a]s the holder of a purely economic interest, the

Stokes Trust was responsible for reporting to the IRS the economic benefit it received

from the Steamworks companies . . . ." We agree with Moore that the IRS filings do not

create a question of fact as to whether "all members" approved the transfer of all

membership rights to the Stokes Trust and its admission as a member of the

Companies.

The record shows that Moore signed both assignment agreements as "Manager"

of Steamworks Management, LLC.[6] Under Section 8.2, membership transfers require

---

[6] Moore and Stokes each signed the other's assignment agreements as the manager of Steamworks Management.

that "the Manager and all Members approve the transferee's admission to the Company as a Member upon such Transfer, *which admission shall be in the reasonable discretion of the Manager . . . .*" (Emphasis added.) Thus, as to the Manager's approval, Section 8.2 expressly gives the Manager discretion.[7]

Moore was the only member who could approve Stokes's assignment of rights to his trust. Section 8.6 bars a member from participating in any decision or voting "in any matter pertaining to the disposition of that Member's Membership Interest" in the Companies. Stokes, the only member in addition to Moore, was barred from voting. Thus, even if Moore was both the manager and the member for the purpose of Stokes's transfer of rights to his trust, the Operating Agreements required his separate approval in each of these capacities.

Here, Kiforenko did not proffer evidence that Moore approved the transfer of all of Stokes's membership rights in his capacity as a member of the Companies.[8] It is not a reasonable inference that only one signature from Moore sufficed to indicate his approval both as a manager and a member. Therefore, Kiforenko does not establish a triable issue of fact as to whether Stokes effectively transferred anything more than an economic interest to his trust.

---

[7] Section 5.1 of the Operating Agreements addresses "Management by Manager," and Section 5.1(b) and 5.1(b)(ix) limit a Manager's authority to engage in "[a]ny other transaction described in this Agreement that requires the vote, consent or approval of the Members." Such transactions require the Manager to "first obtain[ ] the affirmative vote or written consent of Two-Thirds (2/3) of the Percentage Interests of all Members, or such other approval as set forth." Section 8.2 does not require any specific form of approval, i.e., an affirmative vote or written consent.

[8] Kiforenko argues that Moore and Stokes signed the Operating Agreements in their capacities as both managers and members, as evidenced by the fact that there were two signature lines for each person/capacity. But the only signed Operating Agreement in the record, the Steamworks Real agreement, shows that Stokes signed for Steamworks Management in his capacity as a manager, but Moore did not sign as manager. In addition, on two separate pages, Stokes and Moore signed as "individual investors." But the form of signature on the Operating Agreements—the agreements that created the Companies—is not relevant to what form of signature would suffice in a separate agreement to transfer membership rights to a member's trust.

In February 2022, Stokes named Kiforenko as his successor trustee. At the time of Stokes's passing in May 2022, Kiforenko became the successor trustee of the Stokes Trust. Because Stokes had retained his beneficial and voting rights interests in the Companies, by operation of law, upon his death, Stokes dissociated as a member. A person dissociates as a member of an LLC at the time of their death, meaning their "right to participate in a member in the management and conduct" of the LLC terminates. RCW 25.15.131(1)(a), (3)(a).

After the member's death, "the deceased member's personal representative or other legal representative may exercise the rights of a transferee . . . and, for the purposes of settling the estate, the rights of a current member." RCW 25.15.131(5). For example, Stokes's personal representative was entitled to "receive distributions" to which the dissociated member would otherwise be entitled. RCW 25.15.251(1), (2). However, "the mere substitution or replacement of the trustee . . . does not constitute a transfer of such transferrable interest." RCW 25.15.251(6)(b). Thus, upon Stokes's passing, he dissociated as a member, and his non-economic rights and interests terminated.

Upon Stokes's death, the Stokes Trust remained the holder of Stokes's economic interest in the Companies, but Moore became the only member.[9] Because only a member could bring the claims Kiforenko sought to bring in this lawsuit, and the Stokes Trust is not a member, it lacks standing. The trial court did not err in so holding.

---

[9] Further, pursuant to Section 8.5, Stokes's death triggered the Companies' and Moore's right of first refusal to purchase Stokes's membership interest.

II. CR 56(f) Request to Continue Summary Judgment

Kiforenko contends that because the Stokes Trust was initially barred from conducting any discovery, the trial court abused its discretion in refusing to continue the summary judgment hearing to permit the parties to engage in discovery. We disagree.

A court has authority to continue a hearing on a motion for summary judgment when the party opposing summary judgment demonstrates that it cannot present affidavits to support its opposition. CR 56(f). A court may deny a motion to continue a summary judgment hearing to allow a party to conduct additional discovery when the party requesting the continuance (1) does not have a good reason for the delay in obtaining evidence, (2) does not indicate what evidence would be established by additional discovery, or (3) the evidence does not raise a genuine issue of material fact. Bldg. Indus. Ass'n of Wash. v. McCarthy, 152 Wn. App. 720, 742-43, 218 P.3d 196 (2009). Thus, a court may deny a continuance if "[o]nly one of the qualifying grounds" are met. Gross v. Sunding, 139 Wn. App. 54, 68, 161 P.3d 380 (2007). On appeal, courts review a trial court's decision on a request to continue a summary judgment hearing for an abuse of discretion, meaning its decision is based on untenable or unreasonable grounds. Bldg. Indus. Ass'n, 152 Wn. App. at 743.

As the party requesting the continuance, Kiforenko points to Stokes's death as a reason for delay in obtaining evidence—specifically, because Stokes could not testify to the assignment he made to the Stokes Trust. Kiforenko also claims discovery would reveal various documents that he believes would be integral to showing his standing as trustee, including "entity documents from Moore," communications between Stokes and Moore, legal and financial documents for the Companies, and depositions of persons

14

familiar with the Companies. Kiforenko contends that this additional evidence would demonstrate how the Stokes Trust was discussed and represented internally and externally and, thus, would raise questions of material fact as to whether the Stokes Trust was a member of the Companies.

However, as Moore notes, Kiforenko fails to point to any potential evidence that would specifically support a conclusion that the Stokes Trust was a member of the Companies with standing to bring a claim. A trial court may deny a CR 56(f) request if the moving party provides only speculation as to what evidence would be established by additional discovery. Dang v. Floyd, Pflueger & Ringer, PS, 24 Wn. App. 2d 145, 171-72, 518 P.3d 671 (2022). For example, in Dang, the plaintiff sued his attorney for legal negligence, and the court denied his request for a CR 56(f) continuance to depose another attorney who assisted in his case. Id. at 170. On appeal, Dang argued that had he been allowed to depose the other attorney, he would have been able to "further investigate" his attorney's decision-making process. Id. at 171. However, we held that the trial court properly denied the plaintiff's CR 56(f) request because his reasons were speculative and he could not identify "what about [the doctor's] decision-making process he would learn from" the deposition of the other attorney. Id. at 171-72.

As in Dang, here, the evidence Kiforenko seeks is speculative. To prevail under CR 56(f), Kiforenko needed to demonstrate that some evidence existed, but could not previously be obtained, that would prove that the managers and all members of the Companies—i.e., Moore and Stokes—consented to the Stokes Trust as a member. But Kiforenko does not identify any specific entity documents, legal and financial documents, or communications between Stokes and Moore that would demonstrate this

consent. Nor does he identify specific people to depose who would hold this knowledge. To the contrary, Moore attested that he and Stokes had not "approved any other transfer of our membership interest in [the Companies] and no such written approval exists."

Kiforenko fails to establish what evidence would be revealed by additional discovery, much less specific evidence that would be obtained through document requests or depositions, that would create a genuine issue of material fact as to whether he had standing to pursue claims either on behalf of Stokes Trust or as Stokes's personal representative. We conclude that the trial court was within its discretion to deny Kiforenko's CR 56(f) request to continue the summary judgment hearing.

## III. Attorney Fees

Moore cross-appealed the trial court's order denying his motion for fees and costs based on the long-arm statute.[10] However, Moore appears to have abandoned this claim, as his briefing on appeal fails to assign error, provide argument, or cite to relevant authorities to explain why the trial court's order denying him fees and costs was improper. A party who fails to assign error to a trial court order and fails to address the issues in their briefing waives the right to appeal that issue. State v. Olson, 126 Wn.2d 315, 321, 893 P.2d 629 (1995); see also RAP 10.3(a)(6).

Separately, Moore seeks appellate attorney fees because the "Operating Agreements contain a provision authorizing the award of attorneys' fees to the prevailing party." Under RAP 18.1(a), a party can recover attorney fees on appeal "[i]f applicable law grants" such recovery. However, the party requesting appellate fees

---

[10] RCW 4.28.185.

16

must cite to authority and provide argument " 'to advise the court of the appropriate grounds for an award of attorney fees as costs.' " Robinson v. Am. Legion Dep't of Wash., Inc., 11 Wn. App. 2d 274, 298, 452 P.3d 1254 (2019) (quoting Stiles v. Kearney, 168 Wn. App. 250, 267, 277 P.3d 9 (2012)). A prevailing party[11] is entitled to appellate attorney fees when " 'there is a contract, statute, or recognized ground in equity,' " that provides for such award. Umpqua Bank v. Shasta Apts., LLC, 194 Wn. App. 685, 699, 378 P.3d 585 (2016) (quoting Thompson v. Lennox, 151 Wn. App. 479, 491, 212 P.3d 597 (2009)).

Here, Moore cites to Section 10.14 of the Operating Agreement, which provides that "[i]f any dispute between the Company and the Members or among the Members and relating to the Company should result in litigation . . . the prevailing party in such dispute shall be entitled to recover . . . all reasonable fees, costs and expenses of enforcing any right." In response, Kiforenko contends that if the court affirms the grant of summary judgment, then it effectively has confirmed that the Stokes Trust is not a member of the Companies. Consequently, if the Stokes Trust is not a member, his claims are not a "dispute between the Company and the Members," and Section 10.14 does not apply to him as the trustee. We agree with Kiforenko. Because we conclude that the trial court properly concluded the Stokes Trust is not a member of the Companies, he is not bound by Section 10.14 of the Operating Agreement. Accordingly, we decline Moore's request for fees on appeal.

---

[11] A prevailing party or a substantially prevailing party is one that "receives judgment in its favor at the conclusion of the entire case." Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc., 160 Wn. App. 728, 739-40, 253 P.3d 101 (2011).

CONCLUSION

We affirm the trial court's grant of summary judgment dismissing Kiforenko's claims against Moore and the trial court's order denying Moore attorney fees and costs. We also decline to award Moore appellate attorney fees.

_Chung, J._

WE CONCUR:

_Birk, J._                    _Mann, J._